## Note Holders of the Bank of Tennessee *v.* The Funding Board.

1. DEMAND NOTES. *Post-note forms.* The act of 1885, chapter 83, authorizes and directs the funding of " all legitimate outstanding post-notes," meaning the demand notes of the Bank of Tennessee written on the post-note forms.

2. NUMBER OF BANK NOTE. *Effect of. Note holder.* The figures denoting the number of a bank note, in a particular series to which the note belongs, is no part of the contract or obligation, and the fact that the same number has been put upon two or three bills, or that the number has been altered, will not affect the rights of the note holder, if the proof shows the note to be genuine, and that it was actually issued by the bank.

3. DATE OF BANK BILL. *Materiality of.* A date is not essential to a bank bill, which takes effect from its issuance, or re-issuance, and an undated bill will be good if proved to be genuine, and to have been actually issued.

4. MUTILATION OF BANK BILL. *Effect of, upon holder.* The more or less mutilation of bank bills by time or accident will not affect a holder's right to recovery, if the particular bills are shown to be genuine and to have been actually issued by the bank, and if enough remains of the bills to identify them.

### FROM DAVIDSON.

Appeal from the Chancery Court at Nashville.    A. G. MERRITT, Ch.

SPL. HILL and E. I. GOLLADAY for complainants.

VERTREES & VERTREES and WRIGHT & WILLIAMS for defendant.

COOPER, J., delivered the opinion of the court.

This is an agreed case to determine whether certain

notes and bills were issued and put in circulation by the Bank of Tennessee, and should be funded under the act of the Legislature of 1885, chapter 83. The agreed facts show that the bank, in the year 1861, had filled up and used all of its bank notes of the ordinary form struck from its regular plates, and needed more currency. The plates themselves were then in one of the eastern cities, and could not be procured. The officers of the bank found in the bank vault a large number of forms of notes, which had been procured, shortly after the incorporation of the bank in 1838, for the purpose of issuing notes on time to circulate as currency, such notes being known, and in these forms being designated on their face as post-notes. These old forms were then filled up at Nashville, dated September 1, 1861, signed by the president and countersigned by the cashier, and put into circulation as ordinary demand notes of the bank, and not as post-notes. At the last term of this court, upon an agreed case then submitted, we held that these notes, properly signed by the president and cashier, and duly issued in the regular course of business, and for a purpose not shown to be unlawful, were binding upon the bank and the State. Shortly afterward, the Legislature, by the act of 1885, chapter 83, made provision for the redemption and funding of these notes by appointing a board, consisting of the Governor, the Comptroller and Treasurer of the State, to issue certificates for all "legitimate, outstanding post-notes," in a mode and form prescribed. The board was directed to employ two competent experts to examine these notes

and ascertain whether they were genuine or counterfeit. Under this act, a large amount of the notes have been funded. The notes now in controversy, amounting to about $80,000, some of those presented having been withdrawn, were pronounced to be genuine by the experts employed by the board to examine them, and by two members of the funding board, but the third member refused to sign the certificates, prepared and executed by his colleagues, whereupon the present proceedings were instituted. The chancellor, upon the hearing, held that the notes were genuine and binding except those in which the number was altered, and made a reference to the master to ascertain and report these latter notes. Both parties appealed.

The books of the bank show an issuance of notes dated September 1, 1861, to the amount of $466,000, of which, including the notes in controversy, $256,000 have been presented for payment or funding. All of the notes thus issued were filled up by H. L. Claiborne, the general book-keeper of the bank, who says that when so filled they were handed to the cashier to be signed by the president and cashier, and when they were to be put in circulation the cashier brought them to him, and he, as general book-keeper, entered them on the books of the bank, and then they went into the hands of the teller for use at his counter. Claiborne's testimony is made a part of the agreed facts in this case. He says that he has examined each of the notes in controversy, and that each and all are the genuine issues of the bank. "None of

them," he adds, "are spurious or counterfeit. Each bill was signed by G. C. Torbett as president, and John A. Fisher as cashier of the bank at Nashville, and are all genuine. There is no doubt whatever that they are all genuine notes." He is asked on cross-examination: "When you say that there is no doubt whatever that these notes are genuine notes, do you mean that you know they were actually issued and put in circulation by the bank, or do you merely mean to speak as to the genuineness of the impression, signatures and writing made by you?" His reply is: "I know they were actually issued and put in circulation by the bank, because they are entered on the books of the bank, in the proper books, and because of my knowledge of the impressions of the genuine post-note plate, and because I know the signatures of the president and cashier." Elsewhere he adds that he is quite sure all the notes filled by him were used, giving as a reason, on cross-examination, that the bank needed circulation at the time. One of the experts says of the notes in controversy, that "they are all genuine bills, and were each passed by us as such." The other expert states that, in connection with his colleagues, he passed upon each and every bill involved in this case, "and we found them to be genuine bills, issues of the Bank of Tennessee, and so passed them as experts, and they are each, in my opinion, the genuine issue of said bank, and none spurious or counterfeit." One of the members of the funding board says: "I am satisfied that every note of the so-called post-note issue, which has been presented for

funding, is a genuine plate, and the signatures and filling in are all genuine notes of the Bank of Tennessee." And another member of the board says he concurs in this answer, but qualifies his testimony afterward by adding that when he speaks of notes being genuine he means the plates, for he knows nothing of the signatures of the officers of the bank, nor of the genuineness of the plates except as they are generally recognized. The clerk of the State treasurer, who says he was familiar with the proceedings of the experts and the funding board, such proceedings being had in the treasurer's office, and who professes to be an expert on the subject of Tennessee bank notes, especially the Torbett or new issue of the Bank of Tennessee, testifies that he has repeatedly examined the notes in controversy, and that they are, in his opinion, "every one genuine issues of said bank." Being asked, what do you mean by genuine issues, he replies: "I mean that they are from the genuine plate, and bear the genuine signatures of the officers, so far as the signatures, or parts of the signatures, appear on the bills, and that the filling up is in the genuine hand of Maj. Claiborne."

Upon the foregoing testimony, and there is no evidence to the contrary, it would seem very clear that the notes in controversy were the genuine issues of the Bank of Tennessee, regularly put into circulation by the bank, binding upon the bank and the State, and should be funded. To resist this conclusion, the reliance is not upon the testimony of countervailing witnesses, or extraneous proof, but upon something ap-

pearing on the face of the notes themselves.    These peculiarities may be classified thus:

1. Several pairs of notes have the same number, and in two instances there are three notes with the same number, on one of these the numbers not corresponding with any number of the post-note issues as shown by the books of the bank.

2. A few bills have either no date, or only the date of the year.

3. A number of the bills are burned at the lower corners so as to leave only a portion of the signatures of the officers.

4. On some of the bills the number of the bill is altered.

The bills or notes which have the same number are in every other respect, except perhaps in one instance, unexceptionable.    They are filled up in the hand-writing of the book-keeper, properly dated and made payable, and have the genuine signatures of the president and cashier attached.    When the book-keeper is asked how he accounts for the fact of the duplication or triplication of the number, his answer is that there must have been a clerical error in numbering the notes.    And he adds: "I have carefully compared them, and they are each and every one genuine bills and issues."    He is again interrogated about these notes, and asked to say which one of the notes bearing the same number is genuine, and which spurious.    He answers: " " There is no doubt, whatever, that they are all genuine notes.    *    *   ·I have to say that any duplicate numbers were a mere clerical error.    There are no

spurious bills amongst those I have examined, and I mean to say that the whole amount and sum total of the notes in question are accounted for on the books of the bank, and that they were put in circulation as before stated." The proof then, is, that all of the notes of this class are regularly filled up by the witness as book-keeper, that they are properly signed by the president and cashier with their genuine signatures, that they were put into circulation by the bank, and that they were entered upon the books of the bank notwithstanding the discrepancy between the number on the book and the number on the note. The whole number of post-notes issued in 1861 is about 617, and there are thirty-four duplicates, and two triplicates, or about six per cent. of errors. In the absence of all conflicting testimony, although the percentage of clerical errors may be somewhat large for a clerk of average accuracy, even in the troublous times of 1861, we would not be warranted in inferring that there was something wrong, and that any of these notes were not the genuine issues of the bank merely because of the misnumbering. If in fact a larger number of post-notes had been produced than the books and the testimony showed were actually issued, the question would be different. But even then, upon the testimony before us, all we could say would be that the circumstances were suspicious, but the weight of evidence was in favor of the genuineness of the paper.

It is not insisted that a clerical error in the numbering of the bills would vitiate them, if they are clearly shown to be genuine in all other respects, and

to have been issued by the bank. Our banking act of 1860 did require banks to keep a book for the registry of the number, denomination and amount of notes ·intended to be circulated, a violation of which by the officers of the bank was visited with a penalty. But a, clerical misprision as to the number of the notes· would scarcely be treated as a penal offense, and a person into whose hands a wrongly numbered note, genuine and regularly issued, might come, would not be made to suffer for even a willful violation of duty by the officers of the bank.

It is stated in one place in the agreed facts that three notes bear the same number, 30. One of the witnesses examined says that about three of the $500 notes, and two of the $1,000 notes, according to his recollection, bore that number. The original number on some of these bills, he adds, was other than 30, in one of them part of another figure after 30 being quite clear, and in another marks of erasure are distinct. It is proved that four of these notes have been withdrawn. In the argument of one of the counsel for the funding board, it is said that all have been withdrawn except one, and that one has no other figures than 30. The registry of the bank shows that the post-notes issued in 1861 ·commence with number 34 for the $1,000 notes, and number 35 for the $500 notes. The argument is, upon these facts, that the note in controversy must be spurious because no such number as 30 was used on the genuine notes. But there might be a clerical mistake in the number, as in the case of a duplicate number, and if the gen-

uineness of the note were otherwise clearly established, such a mistake would not vitiate.

In the same category must be placed all those notes in which the number has been destroyed, .blurred, or changed by wear and tear of the bill, or affected . by the eating of the ink or by time, the genuineness of the note being in all other respects established. The testimony shows that the paper on which the notes were engraved is little better than tissue paper, of very poor quality, very old and rotten; that the ink has corroded the paper, eaten through in many places, and become faded and often indistinct. Under these circumstances, the holder can not be affected by the wear or dilapidation of the number of the bill, as long as there is enough of the bill left to show that it is in other respects genuine.

The statement of fact says that two of the notes, numbers 72 and 82, have no date of issuance or of payment. A witness explains that 72 has no date except 18—, and 82 omits day and month, but gives the year 1861. If the dates have faded out since the notes were issued, their genuineness and issuance being established, the holder would not be prejudiced. The note on which the year alone is stated would be good, the note being payable on demand after date. Bank notes, moreover, take effect from their issuance, or reissuance, not from their date. And a date is not essential to the validity of any kind of note or bill: Dan. Neg., sec. 83. The proof clearly establishes the genuineness of these notes, and that they were issued by the bank.

Twenty bills of $1,000 each and nineteen of $500 each are burned at their lower corners. The numbers of these bills are distinct and correspond with the numbers on the books of the bank. The bills are all filled up in the hand-writing of the book-keeper, and so much of the signatures of the president and the cashier as are not destroyed by the burning are pronounced by the witnesses to be genuine. The extent of the destruction is not clearly defined. The agreed statement is: "All are mutilated in substantially the same manner. That portion of the post-notes prepared for the signature of the president of the bank has been burned, and that portion of the said notes prepared for the signature of the cashier of the bank has also been burned. The remaining portion of said notes, with these exceptions, is substantially intact." One of the experts testifies: "On nearly every bill, the G. C. of Torbett's name is very plain, and the filling up of each, and the numbering are plainly in the hand-writing of Maj. Claiborne. In some of the bills, we could see Jno. A. but the Fisher was gone." But, he adds, there was enough on the face of these bills to identify them as the genuine issues of the Bank of Tennessee. The book-keeper says: "I did examine them (the burnt bills) carefully, and they are all genuine notes, issues of said bank. They are all filled in my hand-writing as book-keeper of said bank, and are from the genuine plate of the bank, and on the most, if not all, I think all, the letters G. C., the initial letters of Mr. Torbett's name, are left, and are in Mr. Torbett's hand-writing. The bank books show

these notes to be issued, and there are no duplicate numbers. They are genuine bills." He elsewhere testifies that the notes were not entered upon the books of the bank until they had been signed by the president and cashier. The member of the funding board who refused to sign the certificates says: "We also found, excluding those (bills) already referred to, upwards of $30,000 in amount that had the names of both the president, G. C. Torbett, ·and the cashier, J. A. Fisher, burnt off of each bill, except the initial letters, ·G. C. and J. A., and in some instances only the initials and parts of other letters of the name of one of them, and some with only one initial letter of one, and two of the other." Another member of the funding board is asked whether, when he testifies that he is satisfied the signatures and filling in of the notes are genuine, he does not mean to speak of those notes where the signatures remain. His reply is: "I speak of all the notes. In some notes partly burned, the plate and filling up are certainly genuine, and also all of that part left of the cashier and president's name. So I include all the bills." The treasurer's clerk, when asked about the burnt bills, says: "The face of them have the appearance of other notes, the bottom of them having been burned off, leaving a part only of the president's signature. The numbers of these bills are all clear and distinct, and I have compared them with the bank-note register, and the numbers they bore are within the numbers which the register shows to have been issued. There has. been no other bill or bills presented bearing the same

number of any of these bills, and I know of none,. and I think they are each and all the genuine issues of said bank."

It is obvious from the foregoing testimony, that enough remains of the burnt bills to enable the witnesses to depose with confidence to the fact that they are the genuine issues of the Bank of Tennessee. And if the evidence of the book-keeper is to be taken as true, and it is not controverted or impeached, and these particular notes were signed by the president and cashier before being entered on the books, and were issued by the bank, then a more or less mutilation of them would not affect the holder's right of recovery, if enough remains to identify them.

No evidence has been offered to controvert the testimony introduced in support of the genuineness of these bills. The effort is to throw suspicion on them by the circumstances. It is said in the first place that of the burnt bills those for $1,000 are numbered from 270 to 290, and those for $500 from 271 to 290 continuously, which seems to be true. It is hence inferred, and with great probability, that one person got them, and had them when they were burned. But this very fact would go far to explain the uniformity of the burning, which otherwise would be a very strong circumstance indeed against a variety of holders not tracing their title to a common source. The notes are filed in the names of three persons, two of whom, it is admitted, had no interest in the notes, and filed them in their names at the request of a third person, who is a citizen of Nashville. It

is suggested that this is a suspicious circumstance. But the agreed statement of facts shows that it was the rule, rather than the exception, for bills to be filed by one person, when they were the property of another. Over $20,000 of the bills, and in ten different instances, are shown by the record to belong to different persons from those in whose names they were filed; in addition to the burnt bills filed in the same way. These are not circumstances of sufficient weight to change the result of the positive testimony establishing the genuineness of the notes, and do not lay a sufficient foundation to justify us in resorting to conjecture outside of the proof.

The only remaining bills are those in which the numbers have been altered. There is testimony tending to show that some of the numbers have been changed by being written over or by erasure. In all other respects the bills are unexceptionable, being properly filled up by the book-keeper on the post-note forms, and signed by the president and cashier of the bank. All the witnesses agree that they are genuine bills, and the principal witness, the book-keeper, is satisfied they were entered by him on the books after they were signed, and were then issued by the bank. The alteration of a note or bill which will have the effect to discharge the party bound must be in a material part: *Blair* v. *Bank*, 11 Hum., 84; *Taylor* v. *Taylor*, 12 Lea, 714. And all the authorities agree that the figures denoting the number in a particular series to which the instrument belongs is no part of the contract or obligation, and its alteration or erasure

is immaterial: *Birdsall* v. *Russell*, 29 N. Y., 220; *Commonwealth* v. *Savings Bank*, 98 Mass., 12; *City of Elizabeth* v. *Force*, 29 N. J. Eq., 591, overruling same case, 28 N. J. Eq., 587. In all of these cases it was ruled that the number put upon a negotiable instrument is not an integral part of it, and in the first case it was held that it would be an unjust presumption to assume that a change in the numbering of a bond would, as a matter of law, operate as a notice, or as any intimation of the larceny of it. The number, like a vignette or other marking, only serves to identify, and if the instrument is otherwise fully identified a change in the number is immaterial. Of course, the rule operates more strongly in the case of a bank bill, where mere possession is sufficient *prima facie* evidence of *bona fide* ownership for value, and the holder may enforce its payment, unless his position as a *bona fide* holder be successfully impeached. It is not sufficient to show that the holder was negligent in making inquiry, or that he took the note under circumstances which would excite the suspicions of a man of ordinary prudence. The law exonerates him from any such burden, and he can rest secure in his possession, as the evidence of his right to recover, until the defendant shows that he was in privity with the wrong, or acquired the note *mala fide* or with notice: 2 Dan. Neg. Inst., sec. 1680.

There is nothing in the case of the *Merchants' Bank* v. *County of Berger*, 115 U. S., 384, in conflict with these views. The court merely announce there the well settled rule that bonds issued beyond the lim-

ited power conferred upon a municipal board are void. "This is not a case," says the court, "where there existed in the board a general power to issue negotiable securities of the county, so that parties would be justified in taking them when properly executed in form by its officers. It is a case where there was no power except as specially delegated by law for a particular purpose." The fact that the number of the bond in controversy exceeded the numbers which the board, in the events which happened, had authority to issue, was only referred to as evidencing negligence on the part of the plaintiff. The decision would have been the same if the number had been within the numbers of the bonds issued, that is to say, a false number, if the power had been previously exhausted. And, e converso, if one of the bonds actually issued within the power had been numbered erroneously beyond the limit, it would nevertheless have been valid, the genuineness of the instrument, and the fact of its issuance by the board being proved. And the provisions of our banking act touching the registry of bank notes, as we have seen, can not prejudice the rights of the holders of notes properly executed by the officers of the bank, and actually issued.

We are of opinion that the proof establishes the genuineness of all the notes in controversy, and that they were issued by the bank. There is no proof to the contrary, and no such circumstances as warrant us in drawing a different conclusion. The funding act includes "all legitimate outstanding post-notes."

The chancellor's decree will be modified accordingly,

and a decree entered in favor of all the note holders. The State will pay the costs of this court, and the costs of the court below will be paid as directed by the chancellor.